IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

SOFIA MONTANO,

                Plaintiff,

    v.

YOOX NET-A-PORTER GROUP, S.P.A.;
YNAP CORPORATION,

                Defendants.

Civil Action No.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Sofia Montano, by and through undersigned counsel, seeks a permanent injunction requiring a change in YOOX NET-A-PORTER GROUP, S.P.A.'s and YNAP CORPORATION's (collectively referred to herein as "Defendants" or "YNAP") corporate policies to cause the websites they own, operate, or control, to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

## INTRODUCTION

1.      In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf) (last accessed April 18, 2019).

2.      Sofia Montano is legally blind. Ms. Montano has retinitis pigmentosa, which is a group of inherited disorders that cause degeneration of the retina and vision loss. Ms. Montano has progressively lost her vision since childhood and is now blind. Today, Ms. Montano uses screen readers, including the built-in Voiceover capability of her iPhone, combined with JAWS and NVDA software, to navigate the internet.

3.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at *6-7. *See* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed April 18, 2019) (discussing screen readers and how they work).

4.      Defendant YNAP Corporation ("YNAP") is an affiliate of Yoox Net-A-Porter Group ("Yoox").  *See,* https://www.theoutnet.com/en-us/page/help/general-terms-and-conditions-of-sale (last accessed April 18, 2019). Yoox is the "world's leading online luxury fashion retailer." *See,*  http://www.ynap.com/pages/about-us/who-we-are/company-dna/ (last accessed April 18, 2019). Yoox has offices and operations in the United States, Europe, Middle East, Japan, China and Hong Kong, and delivers to more than 180 countries around the world. *Id.*

5.      Yoox owns and manages the multiple websites under its portfolio, described in paragraph 6 below. While Yoox owns and manages the websites, the products purchased on the websites are sold by Yoox's affiliate, YNAP. *See,*  https://www.theoutnet.com/en-us/page/help/general-terms-and-conditions-of-sale (last accessed April 18, 2019). YNAP is a Delaware corporation and is headquartered in New York.

6.      Defendant Yoox owns a portfolio of companies and websites which are in the online luxury fashion sector. The websites include four multi-brand websites owned by Yoox, and 31 online flagship stores which Yoox designs and manages. Each website sells luxury clothing and accessories to consumers. Defendants own and control the following websites:

   a.   www.NET-A-PORTER.com:  "the world's premier online luxury fashion destination for content and commerce. A true innovator, NET-A-PORTER is renowned for its unparalleled editorial content and is a leading destination for the world's most coveted designer brands."

   b.   www.MRPORTER.com:  "the award-winning global retail destination for men's style, combining an unparalleled product offering from the world's best menswear brands, watchmakers and specialist grooming brands."

  c. www.YOOX.com: "the world's leading online lifestyle store for fashion, design & art, offering an extensive assortment of hard-to-find clothing and accessories for men and women from the world's most prestigious designers, as well as a unique selection of home design objects, exclusive collaborations with internationally-renowned artists, socially and environmentally responsible brands and kidswear."

  d. www.THEOUTNET.com: "where to find everything reduced but the thrill. It has grown to be the go-to destination for the style-conscious shopper looking for the best designer products at great prices."

*See,* http://www.ynap.com/pages/about-us/who-we-are/company-dna/ (last accessed April 18, 2019).

  7. In addition to the wholly-owned websites listed in paragraph 6, *supra,* Yoox "is the e-commerce partner of choice for leading fashion & luxury brands, designing and managing ONLINE FLAGSHIP STORES, offering their latest collection on the Internet. With over 19 years of experience in global luxury e-commerce, YOOX NET-A-PORTER GROUP offers brand partners a wide range of services, including creating and developing the creative concept, innovative interface design, state-of-the-art technology and R&D, high-precision global customer logistics, unrivaled customer care, international web marketing and e-commerce strategy development." *See,* http://www.ynap.com/pages/about-us/who-we-are/company-dna/ (last accessed April 18, 2019).  The Online Flagship Stores which Yoox designs, manages, and controls include:

  a. www.marni.com

  b. www.emporioarmani.com

  c. www.stoneisland.com

d.   www.valentino.com

e.   www.dsquared2.com

f.   www.jilsander.com

g.   www.maisonmargiela.com

h.   www. justcavalli.com

i.   www.store.y-3.com

j.   www.moncler.com

k.   www.armani.com

l.   www.pomellato.com

m.   www.bottegaveneta.com

n.   www.stellamccartney.com

o.   www.missoni.com

p.   www.dodo.it

q.   www.alexandermcqueen.com

r.   www.balenciaga.com

s.   www. ysl.com

t.   www.brioni.com

u.   redvalentino.com

v.   www.lanvin.com

w.   www.mcq.com

x.   www.karl.com

y.   www.dunhill.com

z.   www.chloe.com

    aa.  www.armaniexchange.com

    bb.  www.isabelmarant.com

    cc.  www.store.ferrari.com

    dd.  www.balmain.com

    ee.  www.alaia.com

*See,*  http://www.ynap.com/pages/about-us/who-we-are/company-dna/ (last accessed April 16, 2019).   The websites listed in paragraphs 6 and 7 are collectively referred to as "Websites" or "Defendants' Websites.")

    8.    Defendants through their portfolio of Websites, provide the latest high-end fashions in an e-commerce setting. Defendants' partnerships with all major fashion labels provides consumers access to the latest collections and prior seasons' collections at discounted prices, through the Websites Defendants own, operate, and control. *See,* http://www.ynap.com/pages/about-us/who-we-are/company-dna/ (last accessed April 18, 2019).

    9.    In addition to researching Defendants' available clothing and accessories from the comfort and convenience of their homes, consumers may also use Defendants' Websites to contact customer service by phone and email, review important legal notices like Defendant's Privacy Policy and Terms of Service, and research and review the return policies. *See*, e.g., https://www.theoutnet.com/en-us/page/help/general-terms-and-conditions-of-sale (last accessed April 18, 2019).

    10.    Defendants are responsible for the policies, practices, and procedures concerning the Websites' development and maintenance.

    11.    Unfortunately, Defendants deny approximately 8.1 million Americans who have difficulty seeing access to its Websites' goods, content, and services because the Websites are

largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed April 18, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

12.    Plaintiff brings this civil rights action against Defendants to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

13.    By failing to make its Websites available in a manner compatible with computer screen reader programs, Defendants, public accommodations subject to Title III, deprive blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

14.     Plaintiff is informed and believes that Defendants do not have an adequate corporate policy that ensures their websites are accessible to those with disabilities. In particular, Defendant YNAP has been sued at least 15 times for individual online flagship stores, alleging those individual websites are inaccessible. The prior lawsuits related to Alexander Wang, Marni, Moschino, Valentino, Missoni, Maison Margiela, Lanvin, Karl Lagerfeld, Armani, Alberta Ferretti, Kartell, Alfred Dunhill Americas, Moncler, IM USA, and Pucci. Plaintiff is informed and believes that each of these lawsuits resolved issues with those individual websites. However, despite being sued 15 times for inaccessible websites under their portfolio, and despite marketing itself as the "e-commerce partner of choice for leading fashion & luxury brands," the remaining websites Defendants own, control, and maintain, continue to be inaccessible. This demonstrates Defendants do not have a policy of maintaining accessible websites.

15.     This lawsuit does not seek to litigate the accessibility of the individual websites referenced in paragraph 14, which are subject to prior consent decrees relating to the individual websites. Rather, because Defendants' Websites are not and have never been accessible, and because upon information and belief Defendants do not have, and have never had, an adequate corporate policy that is reasonably calculated to cause their Websites to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring that:

a)  Defendants retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist it in improving the accessibility of its Websites, including all third-party content and plug-ins, so the goods and services on the Websites may be equally accessed and enjoyed by individuals with vision related disabilities;

b)  Defendants work with the Web Accessibility Consultant to ensure that all employees involved in website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c) Defendants work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendants' Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Defendants work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Defendants incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Defendants work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Websites, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Defendants directly link from the footer on each page of the Websites, a statement that indicates that Defendants are making efforts to maintain and increase the accessibility of its Websites to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendants through the Websites;

h) Defendants accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Defendants provide a notice, prominently and directly linked from the footer on each page of the Websites, soliciting feedback from visitors to the Websites on how the accessibility of the Websites can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j) Defendants provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Websites;

k) Defendants train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Websites. Defendants shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendants shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is

available to users with disabilities and describing the process to obtain that assistance;

l) Defendants modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Websites to be inaccessible to users of screen reader technology; and

m) Plaintiff, her counsel and their experts monitor the Websites for up to two (2) years after the Mutually Agreed Upon Consultant validates the Websites are free of accessibility errors/violations to ensure Defendants have adopted and implemented adequate accessibility policies. To this end, Plaintiff, through her counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendants.

16.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

17.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

18.     Defendants attempt to, and indeed do so, participate in the Commonwealth's economic life.

19.     Defendants' participation in the Commonwealth hinges, in significant part, on Massachusetts consumers, like Plaintiff, accessing their Websites and using Defendant's products and services. Unlike, for example, a winery that cannot sell and ship wine to consumers in certain

states, Defendants purposefully avail themselves of the benefits and advantages of operating an

online business open 24 hours a day, 7 days a week, 365 days per year to Massachusetts residents.

20.     As described in additional detail below, Plaintiff was injured when she attempted

to access Defendants' Websites from her home in New Bedford, Massachusetts, but encountered

barriers that denied her full and equal access to Defendants' online services.

21.     "Massachusetts has a strong and historic interest in adjudicating this dispute

involving its blind residents. It is the home of the Perkins School for the Blind, which was

America's first school for the blind. Helen Keller was taught there." *Access Now, Inc. v. Otter

Products, LLC*, CV 17-10967-PBS, 280 F.Supp.3d 287, 294 (D. Mass. Dec. 4, 2017) ("*Otter

Products*").

22.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the

judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims

occurred.

## **PARTIES**

23.     Plaintiff is and, at all times relevant hereto, has been a resident of Bristol County,

Massachusetts. Plaintiff  is and, at all times relevant hereto, has been legally blind and is therefore

a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations

implementing the ADA set forth at 28 CFR §§ 36.101, *et seq*.

24.     Defendant Yoox Net-A-Porter Group is an Italian corporation, with its principal

place of business at Italian corporation located and doing business at Via Morimondo 17, Milan,

20143, Italy.

25.    Defendant YNAP Corporation is a subsidiary of Yoox Net-A-Porter Group. YNAP Corporation is a Delaware Corporation, with its principle place of business at 100 Fifth Avenue, 11th Floor, New York, New York, 10011.

## FACTS APPLICABLE TO ALL CLAIMS

26.    While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.


## DEFENDANTS' ONLINE CONTENT

27.    Defendants through their portfolio of Websites, provide the latest high-end fashions in an e-commerce setting. Defendants' partnerships with all major fashion labels provides consumers access to the latest collections and prior seasons' collections at discounted prices, through    the    Websites    Defendants    own,    operate,    and    control.    *See,* http://www.ynap.com/pages/about-us/who-we-are/company-dna/ (last accessed April 18, 2019).

28.    In addition to researching Defendants' available clothing and accessories from the comfort and convenience of their homes, consumers may also use Defendants' Websites to contact customer service by phone and email, review important legal notices like Defendant's Privacy Policy and Terms of Service, and research and review the return policies. *See*, e.g., https://www.theoutnet.com/en-us/page/help/general-terms-and-conditions-of-sale) (last accessed April 18, 2019).

**HARM TO PLAINTIFF**

29.     Plaintiff attempted to access the Websites from her home in New Bedford, Massachusetts. Unfortunately, because of Defendants' failure to build their Websites in a manner that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Websites.

30.     Plaintiff attempted to access the Websites using Apple's VoiceOver technology, combined with JAWS and NVDA software.

31.     VoiceOver is "a full-featured screen reader built into macOS that speaks the text in documents and windows, and describes aloud what appears on your screen…With VoiceOver, you control your Mac primarily with a keyboard, refreshable braille display, or trackpad. You use the VoiceOver cursor—which appears as a dark rectangular outline—to move around the screen, select buttons and other controls, and to read and edit text." *See* Apple, VoiceOver Getting Started Guide, *available at* https://help.apple.com/voiceover/info/guide/10.12/#/vo2681 (last accessed April 16, 2019).



*The VoiceOver cursor—a dark rectangular outline—focused on the word "Accessibility" on screen.*

This caption matches the alternative text that Apple provides in its VoiceOver Getting Started Guide. It illustrates the type of sufficiently descriptive alternative text that screen reader users require to fully and equally access Defendants' Websites.



32.     JAWS (Job Access with Speech) is a computer screen reader program for Microsoft Windows that allows blind and visually impaired users to read the screen wither with a text-to-speech output or by a refreshable Braille display. JAWS is the most popular screen reading technology (JAWS) currently on the market. JAWS reads to the user the content of the website as they navigate it with arrows.

33.     NVDA is a free, open source, globally accessible screen reader for the blind and vision impaired. It is created by NV Access, a charity which services vision-impaired persons. NVDA includes a built-in voice synthesizer and can be downloaded and transported on a USB drive. NVDA reads to the user the content of the website as they navigate it with a mouse or a braille keyboard.

34.     Unfortunately, after visiting Defendants' Websites from New Bedford, Massachusetts, and from investigations performed on her behalf, Plaintiff found Defendants' Websites to be largely unusable due to various barriers that deny her full and equal access to Defendants' online content and services. For example, Plaintiff's investigation discovered

        a.     Defendants' Websites do not properly label search filters for screen readers. For instance, the price filter fields are not properly labeled so a screen-reader user will be unaware of their purpose and unable to use them. Considering Defendants' website www.theoutnet.com offers clothing which ranges from $9 to $10,440, and Yoox.com offers clothing up to $18,370 per item, the price filter search function is an important component of

Defendants' websites. An example of this can be found at https://www.theoutnet.com/en-gb/shop/just-in?cm_sp=Topnav-_-JustInMenu-_-JustIn (last accessed March 26, 2019), and is shown below:



b.    Defendants' Websites prevent screen reader users from accessing the products Defendants offer. For instance, on the products page for each category of clothing or accessory, each product has a "+" button. A consumer who perceives information visually can click on this "+" button and learn more about the product. However, the websites do not provide a label or instruction for the button to screen readers. Thus, when the keyboard focuses on the "+" button, no instructions are provided so it is unclear to a keyboard-only or screen-reader user what functionality it provides. An example of this can be found at https://www.theoutnet.com/en-gb/shop/just-in (last accessed March 26, 2019), and is shown below:



35.     These barriers, and others, deny Plaintiff full and equal access to all of the services the Websites offer, and now deter her from attempting to use the Websites. Still, Plaintiff would like to, and intends to, attempt to access the Websites in the future to browse and purchase products, or to test the Websites for compliance with the ADA.

36.     If the Websites were accessible, *i.e.* if Defendants removed the access barriers described above, Plaintiff could independently research and utilize Defendants' products and access its other online content and services.

37.     Though Defendants may have centralized policies regarding the maintenance and operation of its Websites, Defendants have never had a plan or policy that is reasonably calculated to make its Websites fully accessible to, and independently usable by, individuals with vision related disabilities. This is evidenced by the fact Defendants have been sued on individual website

16

claims for 15 websites, yet instead of ensuring all their websites are compliant in response to the prior lawsuits, Defendants continue to operate 16 additional online flagship stores and four multi-brand websites which continue to be inaccessible. As a result, the complained of access barriers are permanent in nature and likely to persist.

38.     The law requires that Defendants reasonably accommodate Plaintiff's disability by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

39.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendants' failure to provide its online content and services in a manner that is compatible with screen reader technology.

## DEFENDANTS' KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

40.     Defendants have long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids. This is again evidenced by the 15 prior lawsuits Defendants have faced on individual websites they maintain. Again, in response to those lawsuits, Defendants may have modified the individual website at issue to make it accessible, but they failed to take any measures to enact policies to ensure *all* websites they own and maintain are accessible, leading to the continuing injuries to the visually disabled, including those injuries described in this complaint.

41.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

## THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

42.     There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

43.     While the DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

44.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

45.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendants offer content and services on their Websites, and (b) whether Plaintiff can access the content and services.

## SUBSTANTIVE VIOLATION

## Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

46.     The assertions contained in the previous paragraphs are incorporated by reference.

47.     Defendants' Websites are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Otter Products*, 280 F.Supp.3d 293, n.4 ("Several courts have held that a website can be treated as a public accommodation under Title III of the ADA."); *see also 1-800 Flowers.com, 2018 WL 839381, *1* ("Defendant does not dispute that its websites are places of public accommodation subject to regulation by Title III of the ADA.").

48.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendants do not provide Plaintiff with full and equal access to their Websites, they have violated the ADA.

49.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

50.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

51.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

52.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:   as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

53.     By failing to provide their Websites' content and services in a manner that is compatible with auxiliary aids, Defendants have engaged, directly, or through contractual,

licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on their Websites;

(b)     affording individuals with visual disabilities access to their Websites that is not equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford their services, privileges, advantages, or accommodations to individuals with visual disabilities.

54.     Defendants have violated Title III by, without limitation, failing to make their Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

55.     Defendants have further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow their Websites to be made available without consideration of consumers who can only access the companies' online goods, content, and services with screen reader programs.

56.     Making their online goods, content, and services compatible with screen readers does not change the content of Defendants' Websites or result in making the Websites different, but enables individuals with visual disabilities to access the Websites Defendants already provide.

57.     Defendants' ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

58.     Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

59.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendants were in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendants took no action that was reasonably calculated to ensure that their Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendants to take all steps necessary to bring its Websites into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendants have adopted and are following an institutional policy that will in fact cause them to

remain fully in compliance with the law—the specific injunctive relief Plaintiff requests is described more fully in paragraph 15 above.

(C)     Payment of actual, statutory, and punitive damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendants' compliance with the judgment (*see Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) (same);

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendants have complied with the Court's Orders.

Dated: April 19, 2019                    Respectfully Submitted,

                                         */s/ Jason M. Leviton*
                                         Jason M. Leviton (BBO# 678331)
                                         **BLOCK & LEVITON LLP**
                                         260 Franklin Street, Suite 1860
                                         Boston, MA 02110
                                         Phone: (617) 398-5600
                                         jason@blockesq.com

                                         Benjamin J. Sweet (*To be admitted Pro Hac Vice*)
                                         ben@sweetlawpc.com
                                         **THE SWEET LAW FIRM, P.C.**
                                         186 Mohawk Drive
                                         Pittsburgh, PA 15228
                                         Phone: (412) 742-0631

                                         Jonathan D. Miller (*To be admitted Pro Hac Vice*)
                                         jonathan@nshmlaw.com
                                         Alison M. Bernal (*To be admitted Pro Hac Vice*)
                                         alison@nshmlaw.com
                                         **NYE, STIRLING, HALE & MILLER, LLP**
                                         33 W. Mission Street, Suite 201
                                         Santa Barbara, CA 93101
                                         Phone: (805) 963-2345

                                         *Counsel for Plaintiff, Arnold Vargas*